KENTUCKY STATE BOARD FOR ELEMENTARY AND SECONDARY EDUCATION (Substituted as Defendant for Kentucky State Board of Education) an Administrative Board of the Commonwealth of Kentucky, et al., Appellants,

v.

Reverend C. Harry RUDASILL, et al., Appellees.

Supreme Court of Kentucky.

Oct. 9, 1979.

Rehearing Denied Dec. 18, 1979.

Legal and Legislative Services, Kentucky Dept. of Ed., Frankfort, for appellants.

William B. Ball, Ball & Skelly, Harrisburg, Pa., Theodore H. Amshoff, Jr., Amshoff & Amshoff, Louisville, for appellees.

John C. Fogle, and F. C. Bryan, Bryan, Fogle & Riggs, Mount Sterling, for Kentucky Ass'n of School Administrators and Kentucky School Bd. Ass'n, amici curiae.

Arthur L. Brooks and Jennifer Coffman, Lexington, John J. Slattery, Jr., Gen. Counsel, Kentucky Ed. Ass'n, Louisville, for Kentucky Ed. Ass'n, amici curiae.

William Katzinski, Louisville, for Lutheran Ed. Ministries of Kentuckiana, Inc., amici curiae.

Robert L. Heleringer, Louisville, for League of Catholic Parent-Teacher Associations of the Archdiocese of Louisville, Kentucky, amici curiae.

Walter E. Carson, Johns, Carson & Boothby, Washington, D. C., for General Conference of Seventh-Day Adventists, amici curiae.

William E. Johnson, Frankfort, for amici curiae.

LUKOWSKY, Justice.

This case requires us to establish the perimeter within which the Commonwealth may regulate the curriculum and instruction in private and parochial schools. The trial court held that the Commonwealth's textbook approval, teacher certification, and school accreditation requirements, accompanied by the threatened prosecutions of the respondents for alleged violations of the compulsory education laws, violated the first amendment to the federal constitution and section 5 of the Kentucky constitution. We granted a joint motion for transfer of this appeal from the Court of Appeals to this court. Having considered the arguments made by counsel and amici curiae,[1] we reverse in part and affirm in part.

Bert T. Combs and William E. Scent, Tarrant, Combs & Bullitt, Louisville, Robert F. Stephens, Atty. Gen., Robert L. Chenoweth, Asst. Atty. Gen., Edward L. Fossett,

1. Amicus Curiae briefs were filed in support of the judgment below by the Lutheran Education Ministries of Kentuckiana, Inc., The League of Catholic Parent-Teacher Associations, and the General Conference of Seventh-Day Adventists. Both the Kentucky Association of School Administrators with The Kentucky School Boards Association and the Kentucky Education Asso-

This action was initiated by several pastors and their churches, parents of children enrolled in non-public schools of those churches, and the Kentucky Association of Christian Schools, Inc. [church schools]. The parties sought a declaratory judgment that the Commonwealth's standards for approval of private church schools were invalid. The church schools further sought and received below both temporary and permanent injunctive relief preventing the Commonwealth from imposing its approval standards upon the church schools and from prosecuting under the compulsory attendance laws, the church schools or the parents sending children to those schools. The church schools expressly recognized the state's interest in reasonable health, fire, and safety standards for those schools. Therefore, no issue is presented regarding this form of regulation by the state.

The defendants below, and appellants before this court, are the Kentucky State Board of Elementary and Secondary Education and its chairman, The Kentucky Department of Education, the Superintendent of Public Instruction, and four county boards of education along with their directors of pupil personnel [Commonwealth]. The Commonwealth urges that KRS 156.-160, which directs The Kentucky State Board for Elementary and Secondary Education to "adopt rules and regulations relating to: (7) Approval of private and parochial schools of elementary or high school grades; . . .," and KRS 158.080, which directs private schools to "offer instruction in the several branches of study required to be taught in the public schools," permit the Commonwealth to apply their standards for accrediting Kentucky Schools, XLIV Educ. Bull. Ser. No. 11, to the church schools, to require that the church school teachers be certified and to insist that textbooks used in the church schools be from the state list of approved textbooks. Attendance at church schools which are not so approved does not qualify the students there enrolled for the exemption from compulsory attendance in the public schools provided by KRS 159.030, in the opinion of the Commonwealth.

Section 5 of the Constitution of Kentucky provides in part "nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; . . . ." [2] This court has not had occasion to construe this clause of section 5 found within the Kentucky Bill of Rights. But, we have the history of section 5 and of this clause to aid the court in divining the intent of the constitutional draftsmen in settling upon the words they chose to limit the power of the state. The task is now before us. We begin.[3]

The Kentucky constitutions of 1792, 1799, and 1850 each contained a bill of rights

---

ciation filed amicus curiae briefs in support of reversal.

**2.** "Sec. 5 Right of religious freedom.—No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; *nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed*; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience." (Emphasis added)

**3.** We note at the outset that it is obvious that Section 5 of the Kentucky Constitution is more restrictive of the power of the state to regulate private and parochial schools than is the first amendment to the federal constitution as it has been applied to the states. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Consequently, the Supremacy Clause of Article VI of the U. S. Constitution does not require us to ride with the Federales in order to reach a decision. Those interested in the asserted federal issues can find a discussion in Comment, Regulation of Fundamentalist Christian Schools: *Free Exercise of Religion v. The State's Interest in Quality Education*, 67 Ky.L.J. 415 (1979). An overview of education and religion in the Commonwealth can be found in Comment, Separation of Church and State: Education and Religion in Kentucky, 6 N.Ky.L.Rev. 125 (1979).

which provided for religious liberty.[4] The language of these sections remained virtually unchanged until the present constitution was adopted in 1891. The delegates to the Constitutional Convention of 1890 did not casually adopt verbatim the language of the bill of rights as it was found in the previous three Kentucky constitutions. Instead, these delegates examined the guarantees afforded the citizens of sister states by their constitutions along with the traditional protections given to and expected by the citizens of Kentucky. Then guided by their own consciences, they drafted a comprehensive bill of rights for the new constitution. It is generally recognized that the convention of 1890 was comprised of competent and educated delegates who were sincerely concerned with individual liberties. The debate on the bill of rights after it was reported from the Committee on Preamble and Bill of Rights lasted nearly two months and covers almost 950 pages in the published proceedings and debates of the convention. It is from this bountiful harvest of history that we must glean the intent and interpretation of section 5.

The language guaranteeing religious liberty in the Commonwealth reported by the Committee on Preamble and Bill of Rights [5] did not include the clause "nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed." 1 Official Report of the Proceedings and Debates in Convention 300 (1890) [hereinafter cited as Debates]. The clause was specifically adopted by the convention and was the subject of comprehensive pointed debate.

The right of conscience protection relating to schools was the object of three distinct rounds in the debate on the bill of rights. First, the restriction was adopted as an amendment to the report of the Committee on Preamble and Bill of Rights while the convention sat as a committee of the whole. 1 Debates 846–49. Second, during preparation of the report of the committee of the whole for transmittal to the convention, a substitute section was adopted which omitted the clause. 1 Debates 1025. This fathered a debate between the advocates of "no man shall be compelled to send his child or children to any school" [hereinafter referred to as the Knott amendment] [6] and of "no man shall be compelled to send his child to any school to which he may be conscientiously opposed" [7] [hereinafter referred to as the Beckner amendment]. 1 Debates 1027–28; 1034–35. Neither amendment was adopted for the report of the committee of the whole, but this debate served to frame the issue of compulsory education for the third debate. When the report of the committee of the whole came before the delegates in convention, the issue was again debated, and the convention adopted the Beckner language which is present in section 5. 1 Debates 1135–45; 1243.

The debate over section 5 centered on whether compulsory education should be constitutionally proscribed. The first seeds of intent were sown in the first debate:

4. "Sec. 3. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; that no human authority can in any case whatever control or interfere with the rights of conscience; and that no preference shall ever be given by law to any religious societies or modes of worship.

   Section 4. That the civil rights, privileges, or capacities of any citizen shall in no ways be diminished or enlarged on account of his religion."
Ky.Const.1792, Art. XII
The protection of religious freedom was found in Art. X. Sections 3 and 4 of the Constitution

of 1799 and in Art. XIII, Sections 5 and 6 of the Constitution of 1850.

5. Throughout the debate on the Bill of Rights Section 5 was referred to as section 4, as it was numbered in the original committee report.

6. Mr. J. Proctor Knott of Marion County, sponsored the substitute section 4 and an amendment to add "no man shall be compelled to send his child or children to any school" to his substitute section as that clause was "inadvertently omitted" from the substitute as adopted. 1 Debates 1027.

7. Mr. W. M. Beckner of Clark County sponsored this language in all three of the debates on section 5.

"Mr. BECKNER. As is well-known, there is a large element of a great religious organization, to which many persons in Kentucky belong, opposed to the American system of public schools. Their opposition arises from the fact that there is no religious instruction given in those schools. They are as conscientious in their opposition to those schools as I am in my belief in that system. I am anxious for this Convention to do whatever can be done to render our system of public schools acceptable to all our people, and to remove every objectionable or obnoxious feature. It is believed by many that the time will come when we will have compulsory education. I am opposed to inserting in this Constitution any provision looking to compulsory education, leaving it to the future to determine that matter, when our public school system shall have been made more perfect than it is, and when our people are better prepared for it. In the wisdom of those who succeed us it may become proper then to introduce that system. *This amendment simply provides that in the future there shall be no provision made requiring those who are conscientiously opposed to sending their children to public schools to do so. We do not know what may arise in the future in the zeal of those who come after us; and they may attempt to compel persons who are conscientiously opposed to the public schools to send their children to them, fixing pains and penalties for refusal.*"
. . . . (Emphasis added)

1 Debates 847

Even at this early point in the exchange of ideas the Beckner amendment became the compromise position between those who would proscribe the concept of compulsory education and those who would leave the Commonwealth absolutely unfettered.

The opposition to compulsory education was stated pointedly by Mr. Robert Rodes of Warren County:

"There ought not to be any law in our Constitution or enacted by the Legislature to compel a man to send his child to school unless he wants to do it. . . . The family is the proper unit; and I think a good many gentlemen who have spoken will bear me out in the statement that the head of the family is the unity of government in this country, and the family have some rights which ought to be respected and cannot be invaded, and if there are not enough inducements for a man to send his child to school, the government ought not to interfere. . . ."

1 Debates 848–49.

■ The Beckner amendment represented the position that while the state has an interest in the education of its citizens which could be furthered through compulsory education, the rights of conscience of those who desired education of their children in private and parochial schools should be protected. It was anticipated that without express protection of private and parochial education the state might try to prevent children from attending other than public schools. It must be recognized that this debate took place many years before the decision in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) which held the state could not require public school attendance to the exclusion of private and parochial schools. Obviously, the concern of the drafters of the Beckner amendment was well founded.

The Beckner amendment was worded so as to not hamper future legislatures in constructing a system of free public schools and requiring attendance at them by all save those who hold conscientious objection to them.[8] The Knott amendment backers

---

**8.** This purpose is illustrated by the following excerpt from the debate:
"Mr. Beckner: . . . My proposition was that no one shall be compelled to send his child to any school to which he may be conscientiously opposed, saving the conscience of those who are opposed to the public school system. This relieves the public schools of the opposition made by a number of good people throughout the land, that it is a Godless system, and they ought not to be required to send their children. *This does not prevent the Legislature from requiring them to send their children to some school.*

and their views that parents should be able to educate their children at the hearthside did not prevail. It is beyond quibble that the delegates meant to leave to the legislature the question of compulsory education.

Having concluded that the power to require universal education was not vitiated by the Beckner amendment to section 5, it becomes essential to identify the limits of this state power where the boundary between the state's interest in quality education and the individual's conscientious objection to public education is indistinct. May the Commonwealth control the manner in which private or parochial schools teach the young? Again, we look to the debates:

"Mr. Beckner: [M]any think it is the logic of the free school system that those who do not send to the free school, shall be required to send their children a certain portion of time to some other schools, in order to give them the rudiments of an education. . . . My amendment simply says that those who have children shall not be required to send them to schools to which they may be conscientiously opposed. *It does not hamper the Legislature in any way but allows it to provide that they shall send them to some school. It may be a school of their own church, or a school of their own neighborhood. They have the right to choose what school they shall send them to. If the Legislature shall provide that the children shall be sent to some school for a certain portion of time, my amendment does not forbid it. . . . If it be the duty of the State to provide education for all its children, and to see that we have intelligent citizens, and to provide the means for becoming intelligent, then the State ought to be left free to see that the children are sent to schools. . . ."* (Emphasis added)

1 Debates at 1137.

The Beckner amendment supporters clearly intended that the legislature be allowed to compel attendance at some *school*, the choice of which the child's parents could make as a matter of conscience, but the purpose of which would be to educate children to be citizens. That the convention understood the Beckner amendment to permit the requirement of compulsory attendance at a formal *school* vis a vis the family hearth is demonstrated by the perception of its effect by its opposition:

"Mr. Knott: . . . Suppose he has conscientious scruples against all schools. Nevertheless, under the gentlemen's amendment he must send his children to school, although he may be perfectly well prepared and perfectly willing to educate them by his own hearthstone."

1 Debates at 1138.

The use of the word "school" in its ordinary sense by the drafters also supports this conclusion: "In its ordinary meaning the word 'school' denotes a place for systematic instruction in any branch or branches of knowledge." *City of Chicopee v. Jackubowski*, 348 Mass. 230, 202 N.E.2d 913, 915 (1964); *see Kesselring v. Bonnycastle Club,*

MR. CARROLL. Is not your substitute substantially the same as the substitute of the Delegate from Marion?

MR. BECKNER: No, sir.

MR. CARROLL: If a person says, "I am conscientiously opposed to sending my child to a school," can he be made to do so?

MR. BECKNER: I think the Courts would have to determine whether it was a case of conscientiousness.

MR. CARROLL: Is not a man's conscience with himself?

MR. BECKNER: *The Courts would decide whether it was a matter of conscience or whether he wanted to keep his child at home.* Under the Census of 1880, Kentucky had one hundred and eighty thousand more voters who could not read than she had in 1870. The Census of 1880 showed that twenty-nine and three-tenths per cent of the people who ought to have been able to read could not. *Now, if the General Assembly in future should see fit to provide that children should be sent to school during such a period of the year. I should think they should do so, and we should not hamper or prevent the Legislature from passing such a law . . . .* My amendment provides that children may be required to go to school, but parents shall not be compelled to send them against their conscience.

MR. KNOTT: . . . I say every man has a right to educate his children in the bosom of his own family, and not to send them to any school. . . ." (Emphasis added)

1 Debates 1034–35.

299 Ky. 585, 186 S.W.2d 402 (1945). "The word 'school' except when applied to a building or place, implies plurality and consociation." *St. John's Military Academy v. Edwards,* 143 Wis. 551, 128 N.W. 113, 114–15 (1910). "A school the court holds to be an institution consisting of a teacher and pupils . . . gathered together for instruction in any branch of learning, the arts or the sciences." *Benvenue PTA v. Nash Co. Bd. of Education,* 4 N.C.App. 617, 167 S.E.2d 538, 540–41 (1969) *quoting Weisse v. Bd. of Educ.,* 178 Misc. 118, 32 N.Y.S.2d 258 (1941). While the legislature could permit education in the home, it has not done so. *See* KRS 159.010 and 159.030.

The light shed by the purpose of compulsory education expressed by the advocates of the Beckner amendment aids in the definition of the state's interest in private and parochial education. The delegates perceived that universal education might be required in order to prepare children of the Commonwealth to intelligently participate as citizens in a democracy, i. e., to exercise the elective franchise, but not to uniformly develop them socially and morally in the same educational mold.[9] Mr. Beckner stated, "We educate our children here to make intelligent voters of them. . . . The main object of our public schools is that our people may be made intelligent enough to exercise the right of suffrage." 1 Debates at 1142. In support of this argument, Mr. W. R. Ramsey, representing Laurel and Rockcastle counties, said,

"I do not understand by compulsory education, as it has been adopted in other States of this Union, that the parent shall be compelled to send his child to a school which has been provided by the State, but all the provisions which have been adopted by the different States provide that the child shall be placed in some school and receive some education; not that it shall be educated by the public schools of

the State exclusively, but that it shall be sent to some school, either public or private, and educated. . . . If the parent has conscientious objection to sending them to a public school, they must provide other means of educating them, so that they shall have at least twelve weeks schooling in each year."

1 Debates at 1143.

◼ We therefore conclude that the delegates in adopting the Beckner amendment intended to permit the Commonwealth to prepare its children to intelligently exercise the right of suffrage by compelling attendance at a formal school, public or private or parochial, for a legislatively determined period each year. The question now becomes to what extent does the state's interest in educating its citizens to vote in a democracy permit the Commonwealth to control "a school" outside of the free public system.

◼ The Commonwealth constructed the framework for implementing this interest in KRS 158.080. It provides that private and parochial schools shall (1) be taught in the English language; (2) "offer instruction in the several branches of study required to be taught in the public schools;" and (3) operate for a term not shorter than the public schools. From our examination of section 5, it is clear that KRS 158.080 does not offend the bill of rights provided that the "several branches of study" are rationally related to the education of children to exercise their right of suffrage and to participate in the democratic system.[10]

The Commonwealth argues that the KRS 158.080 requirement to "offer instruction in the several branches of study" means that the "*instruments* of instruction, such as teachers and books, be of reasonable *quality.*" Brief for Appellants at 47. Therefore, it is posited, the statute "clearly contemplates that standards may be prescribed . . . with which a school must comply

---

**9.** State controlled homogeneous schools have provided a fertile field for the growth of totalitarian governments. See, e. g., A. Hitler, Mein Kampf, Reynal & Hitchcock Ed. 612–46 (1941).

**10.** Obviously, such basic studies as reading, writing, spelling, grammar, history, mathematics and civics are so related. See KRS 158.-650(3). This is not to say that other subjects may not bear a more remote but still rational relationship.

in order to be approved." *Id.* Section 5 does not allow the Commonwealth to reach this far.

It cannot be said as an absolute that a teacher in a non-public school who is not certified under KRS 161.030(2) will be unable to instruct children to become intelligent citizens. Certainly, the receipt of "a bachelor's degree from a standard college or university" is an indicator of the level of achievement, but it is not a sine qua non the absence of which establishes that private and parochial school teachers are unable to teach their students to intelligently exercise the elective franchise.

The Commonwealth's power to prescribe textbooks for use in private and parochial schools is likewise limited by Section 5. The textual materials used in the public schools are at the very heart of the conscientious opposition to those schools. To say that one may not be compelled to send a child to a public school but that the state may determine the basic texts to be used in the private or parochial schools is but to require that the same hay be fed in the field as is fed in the barn. Section 5 protects a diversified diet.

Pursuant to section 5 of the Constitution, the Commonwealth must "approve" a private or parochial school for the purposes of KRS 159.010 and 159.030 unless it demonstrates the educational institution in question is not a "school" as contemplated by the constitutional convention or does not serve to educate the children of Kentucky to enjoy their right of suffrage. Insofar as 704 KAR 10.022 applies the state accreditation standards to the private and parochial schools of Kentucky, it must fall.

If the legislature wishes to monitor the work of private and parochial schools in accomplishing the constitutional purpose of compulsory education, it may do so by an appropriate standardized achievement testing program. *Wolman v. Walter,* 433 U.S. 229, 238, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *see, e. g.,* KRS 158.690. If the results show that one or more private or parochial schools have failed to reasonably accomplish the constitutional purpose, the

Commonwealth may then withdraw approval and seek to close them for they no longer fulfill the purpose of "schools".

Nothing in this opinion should be read to prohibit:

A. Any private or parochial school from voluntarily complying with state standards of accreditation or seeking the financial advantages of KRS 171.215.

B. Any teacher in a private or parochial school from voluntarily seeking certification pursuant to KRS 161.030(2).

C. The Commonwealth from requiring private and parochial schools to comply with reasonable health, fire and safety standards as conditions of approval.

The judgment is affirmed in part and reversed in part and the cause is remanded for entry of a judgment consistent herewith.

All concur.