Sydell **STONE** et al., Appellants,

v.

James B. **GRAHAM**, Superintendent of Public Instruction, Appellee.

Supreme Court of Kentucky.

April 22, 1980.

William C. Stone, Kentucky Civil Liberties Union, Louisville, for appellants.

Edward L. Fossett, Dept. of Ed., Frankfort, for appellee.

Stuart A. Handmaker, Louisville, for Synagogue Council of America and the National Jewish Community Relations Advisory Council, amicus curiae; Leo Pfeffer and Phil Baum, New York City, of counsel.

Theodore H. Amshoff, Louisville, for Kentucky Heritage Foundation, amicus curiae.

PER CURIAM.

The members of the court participating in the consideration of this appeal being equally divided, the judgment of the trial court must stand as affirmed without an official opinion of this court. SCR 1.020(1)(a). Justice Stephens declared himself disqualified by reason of his having participated in the controversy in his former capacity as Attorney-General. Justices Lukowsky and Sternberg and Chief Justice Palmore being of the opinion that the statute in question is invalid, would reverse. Their viewpoints are expressed in an opinion by Justice Lukowsky which is attached to this opinion. Justices Aker, Clayton, and Stephenson are of the opinion that the statute is valid, and they would affirm. Separate opinions by Justices Clayton and Stephenson expressing their respective viewpoints also are attached to this opinion.

The judgment stands affirmed, subject to the provisions of CR 76.32.

CLAYTON, Justice.

I agree with the trial judge of the Franklin Circuit Court when, in upholding the constitutionality of KRS § 158.178, he wrote:

[T]he fact that the Ten Commandments spring from a religious well does not in itself forever divorce their use for a secular purpose. We can think of no good reason why all or any part of the Bible may not be used for other than religious purposes, for secular purposes, for historical and literary purposes.

Basically, the Ten Commandments is a code of conduct which just happens to be rooted in Judeo-Christian history. For the state to use these particular "rules", if you will, to promote moral and legal behavior

among its youth seems perfectly acceptable to me. I fail to see how this law advances religion beyond the fact that it may bring to one's attention the basic tenets of a particular scheme of Western philosophical thought. Nor do I see how this statute fosters excessive government entanglement with religion, with emphasis on *excessive*.

Justice Clark, speaking for the United States Supreme Court in *Abington School District v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844, 860 (1963), stated:

> [I]t might well be said that one's education is not complete without a study of comparative religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as a part of a secular program of education, may not be effected consistently with the First Amendment.

This statement has particular relevance to this case since the Commandments are presented objectively and as part of a secular program of education.

The knowledge, understanding and dissemination of philosophical and ethical ideas, and the exposure of students to the various political, moral and religious doctrines that are part of our heritage as human beings are certainly necessary and desirable goals in order to educate the young and help them become mature and informed adults. The Ten Commandments statute is not an invasion of a right; it is a cornerstone of knowledge upon which school boards, teachers, and parents may begin to build the intellectual foundations of Kentucky's youth.

STEPHENSON, Justice.

It is my view that the constitutional wall separating church and state is in no danger from the effect of KRS 158.178. Tax money is not involved. Neither the school child nor the faculty member is required to do anything, and the Ten Commandments does

have historical as well as religious significance. In my opinion these factors would withstand any First Amendment challenge.

I am perplexed by the major premise of the opinion of Justice Lukowsky. The major premise bases the result of that opinion solely on Section 5 of the Kentucky Constitution, particularly the "no preference" clause. I find no mention of a "particular creed" in the statute. We do not know, for the record does not reveal, the version of the Ten Commandments displayed in the schoolrooms. This is not in the record for the probable reason that none of the parties viewed Section 5 of the Bill of Rights of the Kentucky Constitution as a problem.

If I understand the posture of that opinion on "creed" as to stand for the proposition that the statute on display of the Ten Commandments offends Section 5 for the reason that Buddhists, Confuscianists, Hindus, Taoists, Shintoists, Sikhs, Jains and Zoroastrainists are creeds whose beliefs do not subscribe to the fundamentals of the Ten Commandments, then I can only say that a statute which required that the Preamble and the Bill of Rights of the Kentucky Constitution to be displayed in the classroom would be equally offensive to those "creeds" since the Preamble reads:

> "We, the people of the Commonwealth of Kentucky, grateful to *Almighty God* for the civil, political and religious liberties we enjoy, and invoking the continuance of these blessings, do ordain and establish this Constitution." (Emphasis added.)

Section 1 of the Bill of Rights reads:

> "All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:
>
> \*    \*    \*    \*    \*    \*
>
> "Second: The right of worshipping *Almighty God* according to the dictates of their consciences." (Emphasis added.)

Unless I am badly mistaken, the reference to "Almighty God" in both does not comport with the beliefs of the Buddhists etc. and in that respect would present the problem of Section 1 of the Bill of Rights of the

Kentucky Constitution being in violation of Section 5.

I just do not believe that Section 5 should be a factor here at all. The statute withstands First Amendment challenge.

LUKOWSKY, Justice, for reversal.

The sole issue before this court is whether the Commonwealth or its agents may require the Ten Commandments to be posted on a wall in each public elementary and secondary school classroom. I would hold that the Kentucky Bill of Rights does not permit such a mandatory display.

The 1978 General Assembly enacted KRS 158.178 [1] which impels this controversy. Simply put, the statute places the duty upon the Superintendent of Public Instruction to post a copy of the Ten Commandments in every public school classroom. The statute makes this duty conditional upon the receipt of voluntary contributions made for such purpose to the state treasury. The drafters of the statute recognized the potential conflict between the interests of church and state, and attempted to finesse any religious motivation by a declaration to be placed on all copies that "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States."

The passage of this statute was perceived to be a challenge to freedom of conscience, and this litigation soon followed. The plaintiffs below, and appellants here, describe themselves as a Quaker, a Unitarian, a non-believer, a mother of school age children and public school teacher, two children of compulsory school age attending public schools, a Jewish Rabbi, and as taxpayers.

They sought temporary and permanent injunctive relief to prohibit the Commonwealth from enforcing KRS 158.178 on the basis that it is unconstitutional. The Franklin Circuit Court restrained and later temporarily enjoined the Commonwealth from implementing KRS 158.178. After hearing the merits, the trial court adjudged KRS 158.178 to be constitutional and dissolved the injunction against the government. This appeal followed. We concurred with the *sua sponte* recommendation of the Court of Appeals for transfer to this court.

This recitation of the facts would be incomplete, however, without a description of a collateral effort to enforce KRS 158.178 *de facto*. The Commonwealth sought an opinion from the Attorney General concerning this statute. The Attorney General summarily stated the statute was constitutional. OAG 78–605. Further, the opinion approved private donations of copies of the Ten Commandments *directly* to the local school boards as being in compliance with the "spirit" of the statute. Following this opinion, an organization called the Kentucky Heritage Foundation actively began to solicit private funds to have copies of the Ten Commandments printed and posted in public school classrooms throughout the state. The Kentucky Heritage Foundation has endeavored to present the issue as a *fait accompli*, announcing in its *amicus curiae* brief that it has raised over $150,000.00, financed 15,000 framed copies which have been placed in all classrooms in 55 counties and in some classrooms in 48 other counties, and that it is working on the remainder.

The combative nature of this case underscores the inherent problems encountered whenever the state delves into religious

1.  KRS 158.178 reads in its entirety:

"(1) It shall be the duty of the superintendent of public instruction, provided sufficient funds are available as provided in subsection (3) of this section, to ensure that a durable, permanent copy of the Ten Commandments shall be displayed on a wall in each public elementary and secondary school classroom in the Commonwealth. The copy shall be sixteen (16) inches wide by twenty (20) inches high.

(2) In small print below the last commandment shall appear a notation concerning the purpose of the display, as follows: 'The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.'

(3) The copies required by this section shall be purchased with funds made available through voluntary contributions made to the state treasurer for the purpose of this section."

matters or religion attempts to use the force of the state to further its evangelical aims. Freedom of conscience and of worship is the cornerstone of the foundation of our nation. There is no "official" church in this country; indeed, it is indisputable that many of our forebears came to America to escape the established church and religious oppression. It is likewise true that once having achieved religious freedom for themselves, certain religious groups became remarkably intolerant of those who held dissimilar religious views, and they sought to employ the power of the state to further their religious beliefs. It is this enigma that the Kentucky and federal constitutional protections of religious freedom were designed to address.

The parties have principally argued this case in terms of the first amendment to the federal constitution, applied to the states through the fourteenth amendment. However, unless and until the statute clears the hurdle of the Kentucky constitution the federal question is academic. This is basic to the concept of federalism because the constitutions of the several states may impose higher standards and give stronger protections than those found in the United States constitution. *State v. Kaluna*, 55 Hawaii 361, 520 P.2d 51 (1974); *State v. Opperman*, S.D., 247 N.W.2d 673 (1976); *Miller v. State*, Tenn., 584 S.W.2d 758 (1979). *See Oregon v. Haas*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967). Consequently, I must first turn my attention to section 5 of the Kentucky constitution.[2]

Section 5 of the Kentucky Bill of Rights is unequivocal: "No preference shall ever be given by law . . . to any particular creed . . . ." It is an inescapable conclusion that the Ten Commandments are a religious creed. This is obvious from the dissension which arose when the Superintendent of Public Instruction invited a committee of various religious leaders, Protestant, Catholic and Jewish, to decide what should be the "official" language of the Ten Commandments to be printed upon the copies to be distributed by the government. The Commonwealth admitted at oral argument that this group was unable to agree upon a mutually acceptable enumeration and wording of the Ten Commandments. We are not advised of the form of the Ten Commandments distributed by the Kentucky Heritage Foundation.

To say that the "differences in the versions of the Ten Commandments are insignificant in serving its secular purpose" as the Commonwealth suggests is preposterous. It is unimportant only if one agrees with the "official" version. For example, the familiar commandment "Thou shall not kill" is also translated as "You must not murder." The difference is significant. The former can be read to prohibit all taking of life, while the latter clearly permits legal killing, e. g., war and capital punishment. For the state to recognize one translation as the "official" one, and require its display to all children who attend public schools, is to give a preference by law to one over the others. Further, there was evidence before the trial court that to some religious groups the Ten Commandments, as a collection, is sacred. Therefore, to label the Decalogue as "secular" in nature detracts from its sanctity.

Webster's Third New International Dictionary defines "creed" in part as "a formulation or epitome of principles, rules, opinions, and precepts formally expressed and seriously adhered to and maintained: . . . ." *See Augustine v. Anti-Defama-*

2. Section 5 reads in its entirety:

"No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister or religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience."

*tion League*, 75 Wis.2d 207, 249 N.W.2d 547 (1977) (quoting this definition with approval). Applying language identical to section 5, Indiana decided, "the word 'creed' has a definite meaning, as a formal declaration of religious belief." *Hammer v. State*, 173 Ind. 199, 89 N.E. 850, 852 (1909). Concisely stated, "a man's creed is what he believes." *Hale v. Everett*, 53 N.H. 9, 92, 16 Am.Rep. 82 (1868). No one can dispute that Christians, Jews and Muslims subscribe to the Ten Commandments as fundamentals of their religious belief. It is safe to say that Buddhists, Confuscianists, Hindus, Taoists, Shintoists, Sikhs, Jains and Zoroastrainists do not.

The first three commandments (or four, depending upon the translation selected) are undeniably religious injunctions, proclaiming the supremacy of the Lord God, commanding that no other gods or graven images be had, forbidding the use of the name of God in vain, and enjoining that the Sabbath be kept holy. The remaining commandments exhibit a somewhat more secular thrust. However, they cannot be taken separately. It would be ludicrous for one to say that the "Six Commandments" can be used for a nonreligious purpose. The Ten Commandments are unitary and indivisible, regardless of the version, and are, as a whole, a creed. Consequently, no preference may be given them by law.

It has been only months since we interpreted section 5 in *Kentucky State Board for Elementary and Secondary Education v. Rudasill*, Ky., 589 S.W.2d 877 (1979). There we decided that section 5 protected those who chose to send their children to religious schools, because they had conscientious objections to "godless" public schools, from intrusive state regulation of religious schools. We are asked here by religious groups to condone state mandated display of a creed in public school classrooms. It cannot be. Section 5 is a sword that cuts both ways.

The government defines public wrongs as crimes. Morals, on the other hand, are philosophical standards set by a community, by a religious dogma, or by personal ethics.

Criminal law standards often differ from moral standards.

"The criminal law does not attempt to impose or enforce the standards of any particular religion, philosophy, or school of ethics. Apart from the fact that it would be difficult to determine which religions, philosophies, or ethical schools should be selected, the standards thereof would for the most part be too high. In a general way it may be said that the aim of a religion, philosophy, or ethical school is, inter alia, the setting of maximum standards for the guidance of human conduct. As a practical matter, the law could not insist that every individual attain such high standards. The law must content itself with establishing and maintaining minimum standards—i. e., standards which are attainable by virtually all individuals—and punishing the failure to conform therewith as a crime." I Wharton's Criminal Law sec. 5 (Torcia, 14th ed. 1978).

It may well be the duty of the state to educate its citizens as to the minimum standards embodied in the criminal law. But when the government decrees that children shall be exposed to the moral precepts of a creed, it has exceeded constitutionally permissible bounds. The reason for section 5 is obvious: who, on earth, is to declare what is "right" or "moral" for the rest of us? The same power which could place a copy of the Ten Commandments on the wall of every public elementary and secondary classroom could place a copy of the Communist Manifesto upon the same wall. The same state that could require a pledge of allegiance to the "Stars and Stripes" could require a salute to the "Hammer and Sickle." The same power that could demand a rote prayer could demand a rote acknowledgement of atheism. The wall that separates church and state protects as it restricts.

Just as the state may not give preference by law to any particular creed, neither may its subdivisions, the local school districts or classrooms. This does not, as some will undoubtedly suggest, prohibit the use of the Ten Commandments or other religious writ-

ings when germane to the secular classroom study of history, literature, philosophy, comparative religion, etc.

In this Commonwealth our leaders are selected by the majority will. But section 2 of our constitution provides: "Absolute and arbitrary power over the lives, liberty and property of free men exists nowhere in a republic, not even in the largest majority." The Kentucky Bill of Rights protects the minority from the arbitrary imposition of moral precepts and philosophies by the majority, no matter how right or desirable it may seem to do so. This does not hamstring those who wish to expose others to their conscientious convictions. The power of the freely communicated belief and rational idea is likewise protected by our constitution. Ky.Const. sec. 1 (Fourth). Those who wish to convince others of their convictions cannot take a shortcut by using the state's power to do it for them.

The Kentucky Constitution was written nearly 90 years ago. In recent years it has been criticized as a "horse and buggy" constitution in a "jet" age. In some respects, perhaps so. But the drafters of this constitution labored long to protect the people of this Commonwealth from unbridled power. Section 26 of the Kentucky Bill of Rights states: "To guard against transgression of the high powers we have delegated, We Declare that everything in the Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void." I would hold that KRS 158.178 gives a preference to a particular creed contrary to section 5 of the Bill of Rights of the Ken-

tucky Constitution and, consequently, is void.[3]

It seems to me that what I have written here is equally applicable to the claim that KRS 158.178 violates the prohibitions of the First Amendment to the Constitution of the United States. The religious injunctions of the first three commandments (or four, depending upon the translation selected) plainly refute the prescribed statement of secular purpose. It is the Ten Commandments not the "Seven (or Six) Commandments" which are required to be posted. Their presence can have no purpose but to advance a religious creed. When measured by the tape of the federal constitution this statute is unconstitutional and void. It has no real secular purpose; it advances religion and fosters excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Ring v. Grand Forks Public School Dist. # 1*, D.C.N.D., 483 F.Supp. 272 (1980); Comment, Separation of Church and State: Education and Religion in Kentucky, 6 N.Ky.L.Rev. 125, 151 (1979). See, *Abington School Dist. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

As the Supreme Court of the United States put it in *Torcaso v. Watkins*, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683–1684, 6 L.Ed.2d 982, 987 (1961):

"We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass

3. Recently, former United States Supreme Court Justice Arthur J. Goldberg wrote concerning the role of the Court:

[T]he first fact about our Constitution [is] that its source is the people. It is they who mandated that the individual be protected and safeguarded in his constitutional rights even against the popular will of the moment as voiced by the legislature or the executive. Our courts were entrusted with the responsibility of judicial review, in large part, to protect individuals and minorities in their fundamental rights against abridgment by both government and majorities.

It is not a denial, therefore, but rather a supreme manifestation of democracy that the fundamental rights of the least among us are protected from government by the Constitution and safeguarded by an independent judiciary. History teaches that democracy and an independent judiciary are inseparable. A country where judges are faithful to the popular will, to the executive or to the legislature, rather than to the rule of law, will not be a democratic country worthy of the name. Goldberg, Reflections on the Role of the Supreme Court in the Pursuit of Equal Justice, 7 N.Ky.L.Rev. 1, 2 (1980) (footnotes omitted).

laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." (footnotes omitted)

I would reverse the judgment of the Franklin Circuit Court and remand the cause with directions to enter a judgment not inconsistent with this opinion.

I am authorized to state that PALMORE, C. J., and STERNBERG, J., join in this opinion.