**WINDSOR PARK BAPTIST CHURCH, INC., Appellant,**

v.

**ARKANSAS ACTIVITIES ASSOCIATION,**
**Appellee.**

**No. 81–1213.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 17, 1981.

Decided Sept. 10, 1981.

Ed W. McCorkle, Arkadelphia, Ark., for appellant.

H. Clay Robinson, Gregory T. Karber, Fort Smith, Ark., for appellee.

Before McMILLIAN and ARNOLD, Circuit Judges, and HANSON,* Senior District Judge.

ARNOLD, Circuit Judge.

Windsor Park Baptist Church, Inc., operates the Fort Smith Christian School, a nonpublic school for grades one through twelve, in Fort Smith, Arkansas. The school is being excluded from interscholastic athletics because it refuses to apply to the Arkansas State Department of Education for accreditation. The District Court [1] held that the rule conditioning participation in interscholastic activities on state accreditation was a reasonable regulation of education, based on neutral, secular principles and purposes, and that no violation of the Free Exercise Clause of the First Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, had been made out. We agree and affirm.

## I.

Counsel have commendably stipulated to most of the relevant facts. Interscholastic activities, including athletics, are regulated in Arkansas by the defendant Arkansas Activities Association (AAA), a voluntary, nonprofit association to which most public, and many private, junior and senior high schools in Arkansas belong. The AAA is, in effect, a delegate of most public school districts in Arkansas with power to regulate interscholastic competition among member

---

* The Hon. William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Hon. William R. Overton, United States District Judge for the Eastern District of Arkansas.

schools. See *Dodson v. Arkansas Activities Association*, 468 F.Supp. 394 (E.D.Ark.1979) (action of AAA in regulating athletics is state action for purposes of the Fourteenth Amendment). Members of AAA may not participate in regular-season competition with non-members. Since there are not many non-member schools, it seems fair to infer that only members of AAA are in a position to offer their students a full range of interscholastic activities, including band, chorus, speech, and the like, as well as athletics. Article III, § 1, of the AAA's Official Handbook (1977) limits membership to "[a]ny junior, middle or senior high school, accredited by the North Central Association or the Department of Education of the State of Arkansas . . . ."

The State's[2] accreditation requirements are set forth in a booklet styled *Policies, Regulations, and Criteria for Accrediting Arkansas Elementary and Secondary Schools* (1965) (referred to in this opinion as *Regulations*), which is in the record as plaintiff's exhibit 4. A portion of these requirements has been restated in a statute enacted in 1969, Ark.Stat.Ann. § 80–4606 (1980 Repl.). A few examples will suffice to illustrate the nature of the requirements at issue. Secondary schools must teach a certain number of units of English, Mathematics, Social Studies, Science, Practical Arts (*e. g.*, Business Education), and Health and Physical Education. Instructional staff, in general, must hold valid high-school teacher's certificates. The school's library must contain at least 900 books, or five books per pupil, whichever is larger, exclusive of textbooks, encyclopedias, and dictionaries. Each teacher must, with some exceptions, teach the major part of the school day in his or her certified field.

The Fort Smith Christian School has been a member of AAA since the school year 1978–79. Its membership was renewed for the year 1979–80 on condition that the school seek state accreditation, a condition that the school at that time accepted.

Thereafter, the school declined to pursue accreditation by the state, on the ground that, as a Christian school owing its entire allegiance to God, it could not be forced to serve two masters by submitting to man's ordinance as contained in the Handbook of AAA and the *Regulations* of the Arkansas State Department of Education. The AAA placed the school on probation for the school year 1980–81 and apparently intends to exclude it from membership altogether for the school year 1981–82, about to begin as this opinion is being written. This suit was brought to compel AAA to continue its recognition of the Fort Smith Christian School, thus enabling the school to continue to participate in interscholastic activities.

## II.

Plaintiff's position is straightforward. Christian education, it says, is an integral part of religion as practiced at the Windsor Park Baptist Church. One tenet of that religion is that religious matters (including education) are subject to divine governance only. The State of Arkansas, in effect acting through AAA, insists that the school violate that tenet by submitting itself to the accreditation process. As a penalty for the school's refusal to submit, the State refuses to allow participation in interscholastic activities with most other schools. The State is thus imposing a cost on plaintiff's members' exercise of their religion, and the First Amendment is violated. These propositions have the virtue of logic and simplicity, and plaintiff's desire to be in the world, but not of it, has considerable appeal. We have concluded, nonetheless, that plaintiff's First Amendment theory is, in the circumstances of this case, foreclosed by controlling authority.

It is settled law that a person may not be compelled to choose between the exercise of religious beliefs and participation in a public program. See *Everson v.*

---

**2.** The parties' arguments on this appeal focus on the validity of the State Education Department's accreditation requirements. Because we hold that those requirements are valid as applied to the facts of record here, we need not discuss the effect of the AAA's reference, in the alternative, to the North Central Association.

*Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). What is equally settled, however, is that activities and practices of individuals, though religiously motivated, are often subject to state regulation under the state's power to promote health, safety, and public welfare. See, *e. g., Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (law prohibiting sales of certain products on Sunday upheld); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (child-labor laws valid as applied to children distributing religious materials); *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878) (law prohibiting the practice of polygamy upheld). The regulations involved here clearly come within the state's power in the area of health, safety, and public welfare.

 The general outline of relevant constitutional doctrine has been clear at least since *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). A State may not "standardize its children by forcing them to accept instruction from public teachers only." *Id.* at 535, 45 S.Ct. at 573. The Fourteenth Amendment forbids the States to prohibit attendance at nonpublic schools, either secular or religious. But it does not forbid reasonable nondiscriminatory regulation designed to advance recognized secular interests, such as the quality of instruction. As a unanimous Court observed in *Pierce* :

> No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character . . ., [and] that certain studies plainly essential to good citizenship must be taught . . . .

*Id.* at 534, 45 S.Ct. at 573. This principle was reaffirmed in *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), where the Court said:

> Since *Pierce*, a substantial body of case law has confirmed the power of the State to insist that attendance at private

schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction.

*Id.* at 245–46, 88 S.Ct. at 1927–28 (footnote omitted).

The regulations in question here fall well within these general statements as to the permissible exercise of state power over nonpublic religious schools. The state's requirements are both neutral and secular. There is no claim that they are biased in a sectarian way, or applied in a biased fashion. Plaintiff without doubt fails to meet these requirements (only half of its 28 teachers are certified by the State of Arkansas, see PX 1), and it refuses, on principle, even to try. Windsor Park's position is a wholesale rejection of any regulatory authority on the part of the State, and the cases simply furnish no support for such a position.

It is true that "there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability." *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972). "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Ibid.* In *Yoder*, for example, the State of Wisconsin brought a criminal prosecution against certain members of the Old Order Amish religion, claiming that they had violated the State's compulsory-attendance law by educating their children, who had completed the eighth grade, at home. Wisconsin law required that students attend some formal, organized school until reaching the age of 16. Extensive testimony, including the evidence of expert witnesses, was received on the 300-year-old history of the Amish, their belief in self-reliance and family life, and the destructive effect on their way of life that forced classroom attendance in modern schools after

the eighth grade would have. The proof also showed that the informal education provided by Amish parents at home was an adequate alternative, even when judged in terms of the interests that the State itself seeks to advance through compulsory high-school education. The Supreme Court held the Wisconsin compulsory-attendance law unconstitutional as applied to the Amish, and summarized its holding in these words:

> In light of this convincing showing, one that probably few other religious groups or sects could make, and weighing the minimal difference between what the State would require and what the Amish already accept, it was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish.

*Id.* at 235–36, 92 S.Ct. at 1543.

The differences between this case and *Yoder* are at once apparent. The State of Arkansas is not proceeding criminally against anyone involved here. So far as we know from this record, the State is perfectly content to allow the members of the Windsor Park Baptist Church to satisfy its compulsory-attendance law by sending their children to the Fort Smith Christian School. The only burden imposed on this exercise of choice is the withholding of a benefit—participation in interscholastic activities—which would not exist in the first place without the efforts of the State and its delegate, the AAA. Nor is it claimed that basketball (this suit was initially precipitated by plaintiff's desire to play in a basketball tournament) or any other interscholastic activity is an integral part of plaintiff's religion, in the sense that education in the home was a part of the Amish belief. No particular state requirement, with some few exceptions that will be discussed below, is said to interfere with religious belief. It is not argued, for example, that having to teach a given number of units of Mathematics prevents the school from teaching all the Bible classes it wishes, in any way it wishes, with any teachers it wishes. One portion of the *Regulations*, applicable to elementary schools, requires the use of a certain number of "approved sets of supplementary readers for each grade," but the proof does not show that the State's approval of these books has anything to do with their religious or philosophical content. On the contrary, the State asserts without real contradiction that its only interest is to see that books are at an appropriate grade level, that is, that first-graders are not expected to read books suitable for sixth-graders. There is no requirement that religious texts be reviewed or approved by the State. And finally, we emphasize again that plaintiff's basic posture (unlike the Amish, who had tried to come to an accommodation with the State of Wisconsin, see *Yoder*, 406 U.S. at 236 n.23, 92 S.Ct. at 1543 n.23) is to reject any State role whatever in assuring that students at the Fort Smith Christian School get a quality education. On this record, the neutral interest of the State is plain and compelling. Compare *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 157–59 (5th Cir. 1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) (upholding an athletic eligibility rule which placed an indirect burden on the free exercise of religion).

Plaintiff does offer a few more focused objections to the State's requirements. The *Regulations*, PX 4, contain a section (not included in the statutes) headed "Criteria for the Evaluation of Arkansas Schools." Criterion 1, PX 4 p. 16, reads in part as follows:

> Criterion 1. Philosophy and Objectives
>
> a. Philosophy. Each school develops a basic philosophy to serve as the guiding principle of its educational program. The written philosophy promotes the spirit of American democracy and is implemented by specific objectives which are evident in the planned program.

The Superintendent of the Fort Smith Christian School expressed a specific and pointed objection to this "criterion."

> I would object to that, because our philosophy promotes Jesus Christ as pre-eminent in everything.

Transcript (Tr.) of Trial, Feb. 11, 1981, p. 103.

On a more fully developed record, the application of this "criterion" could very well render the accreditation requirement invalid as to plaintiff. For one thing, no one definition of "the spirit of American democracy" can possibly commend itself to every citizen. We are hesitant to entrust the definition of that phrase to any organ of government, state or federal. Indeed, we suspect that part of "the spirit of American democracy" is precisely that each individual is free to form a personal view of what that spirit is. Compare *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (State may not compel Jehovah's Witnesses students to pledge allegiance to the flag). In this case, however, any conflict is illusory. For the school's superintendent went on to say:

> We believe that we stress God and country; we have a Christian flag and an American flag in our classrooms, every classroom in our school, during homeroom, has pledges to the Christian flag and the American flag, and the Bible.

Tr. 103. It seems tolerably clear that if plaintiff were to seek accreditation it would not likely fail the criterion in question. We decline to strike down the entire accreditation system on such a speculative and abstract basis.

### III.

Plaintiff emphasizes two cases from state courts which it contends cast doubt on the authority of a state to impose an accreditation scheme on a private school. The first case is *Kentucky State Board for Elementary and Secondary Education v. Rudasill*, 589 S.W.2d 877 (Ky.1979), *cert. denied*, 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 792 (1980), where school-accreditation and teacher-certification requirements were held invalid by the Supreme Court of Kentucky. This case, however, is distinguishable in several important respects and thus offers no support for appellant's position that mere submission to the state's regulatory authority contravenes the First Amendment's protections. First, the *Rudasill* plaintiffs sought injunctive relief to prevent the state authorities from imposing its standards on church schools *and* from undertaking criminal prosecutions under Kentucky's compulsory-attendance laws. Where criminal prosecutions may result, the burden on religious practice is much more direct, as we have already noted in connection with our discussion of *Yoder*. In the case at bar there has been no suggestion that plaintiff or the parents of any of the school's students are faced with a choice of "forsaking their religious practices or subjecting themselves to criminal prosecution." *Braunfeld v. Brown, supra*, 366 U.S. at 605, 81 S.Ct. at 1147.

In addition, *Rudasill* was based on Section 5 of the Kentucky Constitution which provides in part, "nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed." 589 S.W.2d at 879. The court was careful to note that this provision "is more restrictive of the power of the state to regulate private and parochial schools than is the first amendment to the federal constitution . . . ." *Id.* at 879 n.3. *Rudasill* therefore is of no meaningful authority in our case, where plaintiff relies on the general protections of the First Amendment.[3]

The second case cited by appellant is *State v. Whisner*, 47 Ohio St.2d 181, 351 N.E.2d 750 (Ohio 1976). *Whisner*, like *Ru-*

---

**3.** Nor do the Arkansas Constitution's religious protections come to plaintiff's aid. It contains no protections, similar to those in force in Kentucky, that specifically apply to schools. The relevant portion of the Arkansas Constitution reads:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect or support any place of worship; or to maintain any ministry against his consent. No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship above any other.

Ark.Const. Art. II, § 24. The first clause of the second sentence of this Section, which is the provision relevant to this case, is no more specific for present purposes than the First Amendment.

*dasill,* involved review of state standards of school accreditation in the context of possible criminal sanctions to be imposed for violation of compulsory-attendance laws. Unlike *Rudasill,* however, the parties challenging the state regulations in *Whisner* were involved in an actual criminal prosecution, having been indicted by a grand jury and convicted for failure to send their children to a state-accredited school. We need not repeat the importance of this distinction.

The court in *Whisner,* moreover, made clear that the case did not involve a claim "that the state is devoid of all power to promulgate and enforce *reasonable* regulations affecting the operation of non-public schools." *Whisner, supra,* 351 N.E.2d at 760 (emphasis in original). Yet the very argument that plaintiff urges here is that it is unable to "serve two masters and that this would be what was attempted if Fort Smith Christian School sought the approval of the State of Arkansas . . . ." Appellant's Br. p. 8. This argument has no support in the case law, and accordingly the judgment of the District Court is

Affirmed.