Moshe MENORA, et al., Plaintiffs,

v.

ILLINOIS HIGH SCHOOL ASSOCIATION, et al., Defendants.

No. 81 C 960.

United States District Court, N. D. Illinois, E. D.

Nov. 17, 1981.

---

Sylvia M. Neil, American Jewish Congress, David A. Grossberg, Chicago, Ill., for plaintiffs.

John G. Poust, Stephen E. Sward, Wayne F. Plaza, Margaret S. Garvey, Rooks, Pitts, Fullager & Poust, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This action was initially set for hearing November 3, 1981 on plaintiffs' application for preliminary injunction. By agreement of the parties immediately prior to the hearing, the Court ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the preliminary injunction application pursuant to Fed.R.Civ.P. ("Rule") 65(a)(2). This entire action has therefore been tried upon the facts without a jury. After considering all the evidence and arguments of counsel, in accordance with Rule 52(a) the Court finds the facts and states its conclusions of law as follows:

### Findings of Fact

1. Plaintiff Hebrew Theological College, Inc. includes a preparatory division ("Yeshivah") that is a private religious secondary school. Plaintiff Ida Crown Academy ("Academy") is a private religious secondary school operating under the auspices of Associated Talmud Torahs, Inc. Both Yeshivah and Academy teach and adhere to the religious principles of Orthodox Judaism. Each of the minor plaintiffs Sholom Menora, Ronald Alswang, Ronald Bruckenstein, Michael Weiner and Mitchell Sered is (a) a full-time student attending high school at Yeshivah or Academy, (b) a member of the varsity basketball team of his high school and (c) a member of the Orthodox Jewish faith. Each of plaintiffs Moshe Menora, Gilda Alswang, Rabbi Abraham Bruckenstein, Burton Weiner and Dr. Bernard Sered is a parent of one of the minor plaintiffs.

2. Both the individual minor plaintiffs and other male members of the Orthodox Jewish faith are required in accordance with the tenets and principles of Orthodox Judaism to cover their heads at all times except when they are (a) unconscious, (b) immersed in water or (c) in imminent danger of loss of life. Their religious belief requires such head covering as a sign of respect to God, in whose presence they believe themselves to be at all times. Those beliefs stem from the ancient Talmud, described in Webster's Third International as "the authoritative body of Jewish law and tradition developed on the basis of the scriptural law . . . ." None of the stated exceptions applies to students playing basketball. Both Yeshivah and Academy require all male students to cover their heads at all the foregoing times, also in accordance with the same religious beliefs.

* 3. It is the sincere religious belief of each of the individual minor plaintiffs that

---

* Each Finding of Fact prefaced by an asterisk is

based on the parties' stipulation and is there-

he must cover his head at all times specified in Finding 2 as a sign of respect to God. It is the sincere religious belief of each of the individual plaintiff parents that his or her son should cover his head at all times specified in Finding 2 for the same reason.

* 4. Each of the individual minor plaintiffs is a member of a class that comprises all present and future students who attend or will attend Yeshivah or Academy, who are members of the Orthodox Jewish faith whose sincere religious beliefs require them to wear head coverings as stated in Finding 2, but who are prohibited from playing basketball by a rule adopted by defendant Illinois High School Association ("IHSA") unless such class members remove their head coverings and thereby violate the principles of their faith. That class is so numerous that joinder of all its members is impracticable. There are questions both of law and of fact common to the class. Individual plaintiffs' claims are typical of the claims of the class. Plaintiffs as representatives of the class have fairly and adequately protected all the interests of the class both in the earlier hearing and in the current hearing in this action.

5. Prosecution of separate actions by individual members of the class referred to in Finding 4 would create a risk of inconsistent or varying adjudications with respect to such individual members that would establish incompatible standards of conduct for IHSA. Moreover, prosecution of such separate actions would create a risk of adjudications as to individual class members that could as a practical matter be dispositive of the interests of the other members not parties to such adjudications or substantially impair or impede their ability to protect their interests. Finally, IHSA has acted on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

fore uncontested. All other Findings of Fact are based either on uncontroverted evidence or on a substantial preponderance of the evidence (there is no material controversy on factual issues).

6. IHSA is a not-for-profit voluntary association of public and private (both parochial and non-parochial) high schools throughout the State of Illinois. Defendant Lavere L. Astroth ("Astroth") is IHSA's Executive Director.[1] IHSA comprises 835 member schools, 703 of which are public and 132 of which are private. Its funding is derived from an annual membership fee of $25 from each member school plus income derived as a result of sponsoring statewide tournaments, including the Illinois State High School Basketball Championships. All or virtually all Illinois public high schools are dues-paying members of IHSA. With very limited exceptions all private secondary schools in Illinois are also IHSA members. To the knowledge of IHSA's Assistant Executive Secretary Donald Robinson ("Robinson"), who testified during the trial (Astroth did not), only one high school in the entire Chicago area (Lake Forest Academy, a private school that was a member through last year and just recently dropped its membership) is a non-member, though Robinson believes there is a possibility that one or two other private schools might not be members.

7. Although it is not itself a formal agency of state government created by the Illinois General Assembly, IHSA regulates and supervises virtually all interscholastic sports in the State of Illinois including basketball. Under IHSA rules no school can play an IHSA member school unless it is also an IHSA member. By reason of the nearly universal Illinois high school membership in IHSA, any school that is not an IHSA member is effectively excluded from interscholastic competition in the State of Illinois. IHSA's Robinson was aware of no interscholastic activities of Illinois public high schools whatever except under the auspices of and through IHSA.

8. Most IHSA games are played at state-supported schools (primarily on the premises of its public high school members).

1. Astroth is joined in this action solely in his official capacity.

IHSA organizes and operates the annual state basketball tournament involving all its member schools that is universally known as the "state high school championship." IHSA's annual competition leading to the championship is one of the most prominent sporting events of the year, with the final rounds being played on the University of Illinois varsity basketball court at Champaign-Urbana and televised throughout the state.

9. Yeshivah has been an IHSA member for three years and Academy for eight years, during which periods their respective teams have played in IHSA interscholastic basketball competition. At all times during such interscholastic competition all members of their teams, including plaintiff minors, have worn skullcaps ("yarmulkes") secured by bobby pins, except for two occasions on which such usage by the Academy basketball team was challenged by individual referees who could not be dissuaded from enforcing a rule against such use. On those two occasions no religious leader connected with Academy was present, and the decision to allow team members to play without yarmulkes was made solely by the Academy basketball coach (who had no responsibility for enforcing Academy's rule requiring head covering as referred to in Finding 2). All other interscholastic games, during which Yeshivah and Academy team members wore yarmulkes without objection or complaint by opposing teams or referees, were officiated by referees certified by IHSA.

10. IHSA interscholastic basketball is the sole interscholastic athletic activity of both Yeshivah and Academy. Interscholastic basketball competition is an important educational experience that contributes to the physical and emotional health and development of students, and elimination of such competition would have a detrimental impact on Yeshivah, Academy and members of plaintiff class. Any prohibition on Yeshivah's and Academy's ability to participate in IHSA interscholastic basketball would have a material negative impact on the schools and upon their students generally, both apart from and in addition to the negative impact on members of plaintiff class. Playing of interscholastic basketball by Yeshivah and Academy represents to the community at large that those schools are real schools that participate in the mainstream of American life. Such interscholastic play gives the schools and their student body a sense of normality, self-worth and achievement and provides a special outlet for the students' physical and mental needs. IHSA's Robinson confirmed that loss of the opportunity to participate in interscholastic activity would represent a great loss to the students.

11. IHSA is a member of the National Federation of State High School Associations ("Federation"), a voluntary association of organizations in the various states that correspond to IHSA. As part of its activities Federation drafts a set of model basketball rules and related materials, adoption of which is elective on the part of its member associations. State associations are free to choose which Federation rules they wish to adopt. IHSA has elected of its own volition, though it is not bound, to follow Federation's suggested basketball rules at all times relevant to this litigation.

12. Before this action was instituted Yeshivah and Academy had been participating in their regular season interscholastic basketball league play without hindrance from IHSA and had played in the manner described in Finding 9, with all team members wearing yarmulkes secured by bobby pins throughout all such games. This action was precipitated by IHSA's announced refusal to permit Yeshivah and Academy to participate in the state basketball championship elimination tournament beginning in February 1981 unless the team played without yarmulkes. At that time IHSA's basketball rule book, which followed Federation's 1980–81 rule book, provided in Rule 2–2 (emphasis added):

> The referee shall not permit any player to wear equipment which, in his or her judgment, is dangerous to other players. Elbow, hand, finger, wrist or forearm guard, cast or brace made of hard and

unyielding leather, plaster, pliable (soft) plastic, metal or any other hard substance, even though covered with soft padding, shall always be declared illegal. Head decorations, headwear, or jewelry are illegal. *Barrettes made of soft material are legal.* Head bands no wider than two (2) inches made of nonabrasive unadorned, single color cloth, fiber, soft leather, pliable plastic or rubber are legal.

This Court granted preliminary injunctive relief restraining IHSA from enforcing the then rule. During the course of the hearing that led to such relief the Court pointed out, in addition to the First Amendment considerations hereafter dealt with, that no rational distinction appeared to exist between a soft barrette attached to the hair with bobby pins or clips and a yarmulke similarly attached.

13. After this Court's entry of its preliminary injunction order and while this action remained pending, Illinois communicated with Federation about this litigation and the issues involved. Before that communication Federation had sent a "National Federation Basketball Rules Questionnaire (For Preparing the 1981–82 Rules)" to representative basketball coaches and officials in 44 states including Illinois. That questionnaire asked questions as to (a) whether recent rule changes were satisfactory, (b) calling for some general observations on identified issues and (c) whether a number of possible rule changes would be favored by the addressees. Under the heading "Regarding Recent Changes—Are These Satisfactory?" question 5 asked about the rule permitting soft barrettes (underlined in Finding 12):

Stipulating that hair control devices made of soft material may be approved upon examination by the referee.

Over 10,000 responses were received from around the country, 8,766 answering that the rule *was* satisfactory and 1,476 that it was not.[2] Nevertheless in April 1981 Federation's Rules Committee changed its rule for the 1981–82 season by eliminating the provision permitting soft barrettes (this was done by deleting the sentence underlined in Finding 12; in the 1981–82 Rulebook what had been Rule 2–2 became Rule 3–4–5, with that one change). Federation's Assistant Director Robert Schindler, who was and is in charge of its basketball rule books and related activities, testified that the principal reason for the change was the difficulty encountered by officials in interpreting the rule—as to what was a "hard" and what was a "soft" barrette. Chairman Saggau of Federation's Basketball Rules

**2.** At the conclusion of the trial in this action, during which several witnesses testified for each side, IHSA introduced without objection the depositions of three witnesses, two of whom were associated with Federation's Basketball Rules Committee. When during the hearing the Court had asked about the circumstances of the 1981–82 Federation rule change hereafter referred to in this Finding, and its relation if any to this litigation, IHSA's counsel responded that the deposition of Bernie Saggau (Chairman of Federation's Basketball Rules Committee) dealt with that issue. This Court's subsequent review of the Saggau deposition during preparation of these Findings and Conclusions noted a reference to a Federation questionnaire in which there had been a vote of 1,766 (sic) "yes" and 1,476 "no" as to soft material hair control devices (Saggau was clearly disingenuous during his deposition in denying the questionnaire referred to soft barrettes, given the fact that the questionnaire section was about "recent changes" and that the underlined sentence in Finding 12 relating to such barrettes had been the only recent change that dealt with "soft material hair control devices"). When the Court sought to refer to the Exhibits delivered by IHSA counsel, it found that the only one not so delivered was the questionnaire, Exhibit 4 to the Saggau deposition. Upon request by the Court's law clerk IHSA counsel delivered a copy of Exhibit 4 with a forwarding letter referring for the first time to the "typographical error in this [deposition] transcript" in reporting the "yes" votes as 1,766 rather than the actual figure of 8,766. Obviously a six-to-one vote from more than 10,000 knowledgeable basketball coaches and officials in favor of retaining the rule *permitting* soft barrettes (functionally equivalent to yarmulkes in all respects as to safety) has a devastating effect on the "compelling necessity" of a *new* rule to serve IHSA's stated purpose of prohibiting yarmulkes to assure safety. It is quite apparent that but for the Court's request Exhibit 4 would not have been delivered and, most important, the significant "typographical error" that disclosed the six-to-one vote consequently would never have been brought to the Court's attention.

Committee testified to the same effect. According to Schindler hard barrettes were viewed as presenting a hazard because of head and face contact. When it reconsidered and changed its rule after this litigation had been instituted, Federation had no information as to any *slippages* or *injuries* having occurred as the result of the wearing of soft barrettes or yarmulkes, although its stated reason for the head covering rule is to promote safety. Federation witnesses, whose depositions were taken before trial and were therefore not available for questioning by the Court, were vague (as was IHSA's Robinson) as to the timing and causal nexus between this litigation, the communications from IHSA to Federation and the reversal of the rule change to prohibit soft barrettes. Especially in light of the six-to-one vote from over 10,000 respondents in favor of retaining the soft barrette rule (in response to a questionnaire whose stated purpose was "for preparing the 1981–82 Rules") and the total absence of any information that soft barrettes (or yarmulkes) had in fact caused any problems of safety, it taxes credulity that the change in the rule was not at least in part responsive to the pendency of this litigation. This Court accordingly finds that the rule change had to be motivated in part by the effort to avoid the impact of the ruling in Finding 12.[3] Under any possible interpretation, for safety and all like purposes a yarmulke is the functional equivalent (although not of course the religious equivalent) of a *soft* barrette, not a hard barrette.

14. Slips and falls by players are common to the game of basketball. Minor injuries such as skin abrasions or sprained ankles are also common to the game. Such minor injuries often result from contact with other players and occasionally fans. Federation did not have, nor did IHSA, any information as to a single instance of slippage or a single instance of injury resulting from a yarmulke having come loose and fallen on a basketball court during interscholastic or non-interscholastic play. Fed-

eration did not have, nor did IHSA, any information as to a single instance of slippage or a single instance of injury (either to a male or to a female player) from a bobby pin or clip having been worn or having fallen onto a basketball court during interscholastic or non-interscholastic play. Testimony by witnesses with substantial experience in coaching, observing and refereeing basketball games played by one or both teams wearing yarmulkes (such testimony referred to more than 1,300 interscholastic games and an unidentifiably larger number of non-interscholastic games) reflected not a single instance of either slippage or injury from either yarmulkes or their associated bobby pins or clips.

15. In all the games testified to by the witnesses, or that were the subject of a questionnaire directed by IHSA to its officials who refereed 1980–81 games involving Yeshivah or Academy (that questionnaire was sent after this action was instituted), yarmulkes have become loose and fallen from players' heads onto the basketball court an average of perhaps one or two times per game (often they did not fall at all; no witness remembered more than three such instances during any one of the over 1,300 games). In every instance the yarmulke has promptly been removed from the floor by one of a number of means, including removal by a player or referee while the ball is in play or by a fan, player on the bench or coach when play stops.

16. Eyeglasses, both unsecured and secured to a player's head by elastic bands, often fall from players' heads onto the basketball court during games. If a player stepped on glasses during game action, his likelihood of slipping and falling would be increased, just as such likelihood would be increased if a player stepped on a yarmulke or any other foreign object on the floor. Foreign objects such as paper and coins are unfortunately thrown by fans onto the basketball court from time to time during basketball games, and paper is from time to

---

3. This Court's Conclusions of Law would be the same without reference to, or any dependency on, the finding in this last sentence. It is however most troublesome to encounter what appears to be a pretextual basis for the adoption of the current rule.

time left on the court as a result of the incomplete cleaning up of paper detached from pompons used by cheerleaders during times out or between halves. IHSA rules do not prohibit persons wearing glasses from playing IHSA interscholastic basketball. Nor do IHSA rules ban attendance at games or cheerleader participation during games. Slippage often occurs during basketball games due to wet spots on the court (whether the result of players' sweat dropping onto the floor or, more likely, the result of players falling to the floor and leaving a wet area). No IHSA rule requires automatic stoppage of play to wipe up wet spots. Instead the wet spots are not wiped until play stops.

17. IHSA has not in fact adopted all feasible rules to maximize safety during basketball games. During the course of this litigation it changed from a rule that permitted the wearing of soft barrettes (and therefore could not rationally have barred yarmulkes, the equivalent of soft barrettes in every relevant respect) to a rule that prohibited such soft barrettes. It has adopted that new rule despite (a) the total absence of any evidence of slippage or injury having in fact occurred because of the wearing of soft barrettes or yarmulkes and (b) the very large six-to-one vote received by Federation (whose new rule IHSA simply adopted) favoring retention of the rule permitting soft barrettes.

## Conclusions of Law

Neither the Fourteenth Amendment[4] nor 42 U.S.C. § 1983 ("Section 1983") imposes a restriction on purely private conduct. Un-

der the Fourteenth Amendment the limitation is on what "any State" shall do, while Section 1983 implicates only action "under color" of state law.

▪ Although IHSA is not directly a creature of the Illinois Constitution or General Assembly, there is no question that the state action requirement is satisfied here. IHSA embraces all Illinois high school interscholastic activity, not only of the public high schools (the critical fact for state action) but of private schools as well. It sets itself up as conducting the "state high school basketball championship"—and by the combination of universal membership among public high schools[5] and the IHSA rule prohibiting interscholastic competition by its members with non-members, it has kept that promise. Most of its activities are conducted at public schools, with the finals of what everyone knows as the "state tournament" (formerly the Sweet Sixteen, now the Elite Eight) concentrated in a March weekend at the University of Illinois basketball fieldhouse in Champaign-Urbana.

That congeries of facts plainly comports with the standard established in the "white primary" cases beginning with *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), to support a holding that IHSA's action is "state action." IHSA fought and lost the same battle in *Bucha v. IHSA,* 351 F.Supp. 69, 73 (N.D.Ill.1972). Under the circumstances this Court is prepared to and does exercise its "broad discretion" to apply the doctrine of offensive collateral estoppel as since expressed in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326–33, 99 S.Ct. 645, 649–52, 58 L.Ed.2d 552 (1979).[6] But even if

---

4. Where as here the constitutional right asserted by plaintiffs is a Bill of Rights provision incorporated by settled case law into the Fourteenth Amendment, it has become customary to refer directly to the underlying Amendment. This opinion will follow that usage and speak of the First Amendment except where, as in this paragraph, language of the Fourteenth Amendment itself is relevant.

5. According to IHSA's own testimony no public high school is known to be a non-member. Indeed only one private Chicago-area high school (itself a dropout just this year) is a known non-member (IHSA's Assistant Execu-

tive Secretary Robinson speculated that there might be one or two other non-public schools outside the fold).

6. Under the tests enunciated by the Supreme Court (see 439 U.S. at 331–32, 99 S.Ct. at 651–52) "there is no unfairness" to IHSA in applying the doctrine. IHSA "had every incentive to litigate the [earlier] lawsuit fully and vigorously." Judge Austin's "judgment in [*Bucha*] was not inconsistent with any previous decision." Finally, there are "no procedural opportunities available to [IHSA in this case] that were unavailable in [*Bucha*] of a kind that might be likely to cause a different result."

collateral estoppel were not to apply, this Court reaches the same decision on the merits as did Judge Austin in *Bucha*, holding that IHSA's action is "state action," so that IHSA must comply with the First Amendment and is therefore within Section 1983.

But IHSA's status as a *private* party carrying on state action poses another problem not addressed by the litigants. Absolutist First Amendment doctrine, as propounded by Justices Black and Douglas, has not prevailed. Instead the Supreme Court has announced and applied a kind of balancing test. It requires a "compelling state interest" that can "survive exacting scrutiny" to outweigh First Amendment rights, *Elrod v. Burns*, 427 U.S. 347, 362–63, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976):

(1) States must bear the burden of showing the existence of an interest that is "paramount" and "of vital importance" to support encroachment on First Amendment rights.

(2) "It is not enough that the means chosen in furtherance of the [paramount state] interest be rationally related to that end.... If the State has open to it a less drastic way of satisfying its legitimate interests, it must exercise that less restrictive means."

(3) Only then does a court determine, weighing the competing factors, whether the interest secured can overbalance the abridgement of such a fundamental freedom.

(4) If the court finds that the gain to the state "outweighs the loss of constitutionally protected rights," the means employed must be closely drawn, narrow in scope and specific to avoid unnecessary abridgement. Means may not be chosen that unnecessarily restrict constitutionally protected liberties.  .

Unquestionably that measuring process is responsive to concerns about what the Supreme Court has called, in another context, Our Federalism. Under Our Federalism policies of state government enter into the scales with a degree of deference precisely because they are *governmentally* created.

■ Here however no real voice of state government has spoken in the same sense at all. We do not deal with an enactment of the Illinois General Assembly or any municipal government. No state court has announced a doctrine that must be given serious attention out of respect for federalism principles. No state executive elected by the people, or appointed by the executive elected by the people, has promulgated regulations. Rather we have a wholly *self-appointed* body whose actions, because of all the circumstances, are treated for legal liability purposes as the equivalent of "state action."

This is not the kind of democracy at work that calls for the balancing of interests doctrine to be applied with the same force as in the cases on which IHSA would seek to rely. IHSA is not responsible or responsive to the public will. Its officials take no oath to support the Constitution. One of the reasons for the deference given to state government in First Amendment cases must be the belief that when it acts in its official capacity, its legislators or executives do so with a keen awareness of the respect to be paid to individuals' constitutional rights—particularly the fundamental principles embodied in the First Amendment.

This Court was not surprised to find no cases discussing this issue. It is relatively rare for a private party to exercise public functions in such a way as to bring state action concepts into play. But the Court is convinced that, for example, had the Supreme Court in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) been called upon to engage in the balancing process (that is, had the conduct of the private restaurateur-lessee been less clearly violative of constitutional rights than a "whites only" rule), the actions of the restaurateur-lessee (deemed "state action" for legal purposes) would not have been given the same weight as decisions of an elected state legislature.

Here the IHSA officials have demonstrated no sensitivity to First Amendment rights. Their business is after all to regu-

late basketball play, and if someone's First Amendment rights are infringed by the regulations IHSA's view is that they need not play basketball. IHSA's "legislation" should not be credited with anything like the force that federal courts accord true legislation of elected officials of state government.

Having said all this the Court emphasizes that, as the discussion hereafter will demonstrate, IHSA's rule does not pass the conventional strict scrutiny test in any case. What the preceding discussion goes to is the notion that if any doubt were to exist on that score, it should be resolved *against* rather than *for* IHSA.

■ As already indicated by the brief summation of *Elrod v. Burns* principles, the Supreme Court teaches that any infringement of fundamental freedoms must survive the most exacting scrutiny. Free exercise of religion, the right invoked by plaintiffs, is just such a fundamental freedom. *Wisconsin v. Yoder*, 406 U.S. 205, 214–15, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972). *Accord, Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

■ This case presents a striking parallel to *Yoder*. Plaintiff students share a strong religious belief that covering their heads is mandated out of respect to God. Their parents, Yeshivah and Academy share the same beliefs and a strong desire to have the principles adhered to by the minors. On uncontroverted testimony the minor plaintiffs are faced with material psychological harm from being placed in conflict between their religious beliefs and participation in a student activity, and parents and schools want to avoid those harms. Again the evidence of the importance of interscholastic

play is uncontroverted—it is not simply a desire for athletic activity that could be satisfied by other means. Findings 2 and 10 are conclusive that the issue is one of material significance to plaintiffs that rises to constitutional dimensions.

As against such considerations rooted in the free exercise of religion clause of the First Amendment, IHSA asserts its concern with safety of students. But assertions of such concerns, without *any* evidence of substantiation, cannot meet the heavy burden of those resisting the assertion of First Amendment rights. Once or twice a game yarmulkes do fall to the playing floor. Of course glasses fall to the floor, other foreign objects come onto the floor—left over from pompon girls' cheerleading, or thrown there by unthinking or criminally negligent fans. This Court does not minimize the hazards posed by foreign objects—quite the contrary. But IHSA has not legislated away the right of glasses-wearing basketball players because of the risk. On the uncontroverted facts the risks posed by yarmulkes and their appurtenances are totally speculative. Federation received but ignored an overwhelming majority vote from a very wide spectrum of its constituency that would have *continued* the permissibility of soft barrettes—indistinguishable in terms of safety from yarmulkes. IHSA slavishly followed Federation in that respect, without any examination whatever of whether the risks it now claims are controlling were real or speculative.[7]

Even apart from the even *higher* standard than "compelling state interest" that should logically apply to IHSA, the rule does not under the undisputed facts of this case serve such a "compelling interest."[8]

**7.** As previously indicated, this Court has real questions as to the total candor of Federation and IHSA witnesses as to the motivation for the rule change. There is no credible evidence that the soft barrette rule was reversed for *safety* reasons, for there was absolutely no evidence of any adverse occurrences in the interim—and the *speculative* harms were no different in 1981–82 than in 1980–81. Finding 13 and n.2 refer in detail to the Federation questionnaire that materially impairs IHSA's credi-

bility on its own assertions. And the stated problems of rule administration (referees' possible inability to distinguish between a "soft" and a "hard" barrette) cannot serve a "compelling state interest" as to "soft barrettes," which have posed no real safety hazards in fact.

**8.** When 8,766 of 10,242 representative basketball coaches and officials throughout the country (86% of the large number responding)—all of course concerned with basketball safety—find the rule permitting soft barrettes (which

When the additional factor—IHSA's absence of responsibility of the same nature as public officials—is put into the equation, the conclusion that the rule must be found wanting to overcome First Amendment rights follows a fortiori.

IHSA's argument involves an impermissible sleight of hand: It falsely equates basketball safety with prohibiting yarmulkes. Basketball safety is of course a legitimate IHSA goal, but this Court need not even consider whether that legitimacy represents a "compelling state interest" in constitutional terms. For what this lawsuit is about is not the abstract question whether IHSA can decree basketball safety, but rather the specific question whether it can prohibit the wearing of yarmulkes and override the exercise of First Amendment rights. As to *that* question, this Court need not again recount in detail the uncontroverted evidence (principally (1) the total absence of proof of real, not speculative, hazards and (2) the overwhelming views of Federation's informed constituency) that prohibiting yarmulkes does not serve a "compelling state interest."

This Court has reviewed the federal cases cited by IHSA [9] and finds none of them persuasive. In each of those cases the court found the burden on free exercise of religion to be insignificant in magnitude—*de minimis*. That is *not* the case here, for the evidence—entirely credible evidence—is that the burden on plaintiffs is a significant one and the Court so finds (see Findings 2 and 10). It will not do to disparage that claim, for to do so would be much as if those of . us who do not share plaintiffs'

religious views were to evaluate the importance of those views.[10]   *Thomas v. Review Board*, 450 U.S. 707, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981) teaches once again that it is impermissible for us thus to search men's consciences.   It would be equally wrong for us to reject the serious impact on plaintiffs imposed by IHSA's rule, which would make it impossible for plaintiffs to participate in interscholastic athletics and still exercise their First Amendment rights. At least equally important, in each of the cases IHSA seeks to invoke, the rules involved were found to represent compelling state interests. On the undisputed evidence here the only reason asserted by IHSA to be placed in *its* balance scale is not at all "compelling."

So we have a balancing process in which the scale favoring those who claim First Amendment rights is far more heavily weighted, and the scale favoring those who seek to infringe those rights is far less heavily weighted, than in the cases on which IHSA seeks to rely. That balancing process produces no contest—in basketball terms IHSA loses by too many points to make keeping score worthwhile.

IHSA's motion for involuntary dismissal under Rule 41(b) made at the close of plaintiffs' evidence is of course denied. For the reasons stated in the foregoing Findings of Fact and these Conclusions of Law:

1. This Court confirms its determination made at the time of trial that this action should be, and it has properly been, maintained as a class action in favor of and binding all members of the class referred to in Finding 4.

could not then allow yarmulkes to be prohibited) satisfactory, IHSA must be viewed as having failed utterly to demonstrate a "compelling interest" in the prohibition.

**9.** *Windsor Park Baptist Church, Inc. v. Arkansas Activities Ass'n*, 658 F.2d 618 (8th Cir. 1981); *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152 (5th Cir. 1980); *Valencia v. Blue Hen Conference*, 476 F.Supp. 809 (D.Del. 1979), *aff'd without opinion*, 615 F.2d 1355 (3d Cir. 1980). As for *Dennis J. O'Connell High School v. Virginia High School League*, 581 F.2d 81, 84–85 (4th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979),

that case is wholly inapposite. As the language quoted in IHSA's brief demonstrates, there was "no fundamental right or suspect classification involved" there. Under those circumstances the "rational relationship to a legitimate state purpose" standard applies, not the much higher strict scrutiny test that any First Amendment infringement must meet.

**10.** On that score (the recognition in constitutional terms of plaintiffs' yarmulke-wearing beliefs) see such cases as *Goldman v. Secretary of Defense*, Civ.No. 81–1522 (D.D.C. July 10, 1981); *Gassel v. Adams*, No. 78 C 2120 (N.D.Ill. 1978).

2. This Court declares that defendants may not bar persons from participating in IHSA-affiliated, sponsored, supervised or controlled interscholastic basketball competition because such persons wear head coverings in accordance with their religious beliefs.

3. Defendants are ordered to allow the minor plaintiffs and all other class members to participate in such interscholastic basketball activity without requiring them to remove such head coverings worn in accordance with their religious beliefs.

4. Defendants, their officers, agents and employees, and all persons in active concert or participation with any of the foregoing who receive actual notice of this Court's order by personal service or otherwise, are permanently enjoined from barring plaintiffs and other class members from participation in such interscholastic basketball activity without requiring them to remove such head coverings worn in accordance with their religious beliefs.

5. This Court retains jurisdiction for purposes of enforcing the foregoing orders and to consider any application for costs and attorneys' fees plaintiffs may hereafter elect to file in accordance with the prayer of their Complaint.

